**FILED**

**JAN 21 2015**

Clerk, U.S. District and
Bankruptcy Courts

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CARMEN PITTMAN,<br>404 Glen Iris Dr. NE<br>Atlanta, GA 30308,<br><br>      PLAINTIFF<br>vs.<br><br>UNITED STATES OF AMERICA<br><br>      DEFENDANT | Case: 1:15-cv-00106<br>Assigned To : Jackson, Ketanji Brown<br>Assign. Date : 1/22/2015<br>Description: Pro Se Gen. Civil |

## COMPLAINT

### THE PARTIES

1.  Plaintiff Carmen Pittman is a citizen of Georgia.

2.  The Federal Protective Service (FPS) is a component of the Department of Homeland Security (DHS), an agency of Defendant the UNITED STATES OF AMERICA. At all times relevant to this FPS officials were acting under color of federal law within the scope of their employment at DHS.

### JURISDICTION AND VENUE

3.  This action arises under the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.*

4.  This Court has jurisdiction over the parties and subject matter pursuant to 28 USC § 1346(b).


RECEIVED

JAN - 7 2015

Clerk, U.S. District and
Bankruptcy Courts

1

5. Venue is proper in this district pursuant to 28 USC § 1402(b) because the events or omissions giving rise to this action occurred in the District of Columbia.

## STATEMENT OF FACTS

*Background on TASER devices*

6. Electrical Control Devices (ECDs) are handheld weapons that deliver brief bursts of rapidly pulsing electrical current.

7. ECDs cause intense pain and incapacitating muscle contractions, either through two darts attached to wires or directly from contact with exposed electrodes.

8. Since TASER Intentional, Inc. captured the ECD market following the release of its first high-power ECD, the Model M26, in November 1999, followed by its equally high-power, but more compact Model X26 in 2003, there have been a growing number of reports that the devices have been abused, or caused catastrophic injuries and death.

9. In a comprehensive report, Amnesty International identified 334 deaths associated with TASER International products in the United States from June 2001 through August 2008, almost all cardiac arrests.

10. There are numerous risks of using ECDs including a dart in the eye, ignition of flammable substances, fall-related trauma, orthopedic fracture or dislocation, and cardiac arrest.

11. Both TASER Model M26 and X26 operate the same way. A plastic cartridge slips onto the front of the "barrel." Switching off the safety activates a laser sight, the dot of light representing the target for the top dart.

12. Pulling the trigger fires two darts, each bearing a barbed point nine millimeters long, connected to wires ranging in length from 15 to 35 feet. The top dart

travels straight while the bottom dart angles downward so that the darts spread one foot for each seven feet traveled. The wider the spread, the more effective the electrical discharge will be in causing muscle incapacitation.

13. Both the Model M26 and X26 are set to cycle automatically for five seconds, accompanied by the audible clicking of the electrical pulses. The cycle can be ended sooner, however, by engaging the safety, or it can be prolonged by holding down the trigger longer than five seconds, continuing until the release of the trigger.

14. Five second cycles can be repeated with additional trigger pulls and prolonged cycles continued until the device overheats or the batteries wear out, a period of up to ten minutes depending on battery strength.

15. The effect of an ECD is like a debilitating, full-body seizure, complete with mental disorientation and loss of bodily functions. It is extremely painful.

16. When effective, the electrical current causes the skeletal muscles to contract severely throughout the extremities, making the person stiffen and fall without means of self-protection.

17. A person generally cannot comply with instructions while being shocked, and contractions in the arms may make it difficult for officers to move them into handcuffing position while the current is active, although TASER International trains this tactic, calling it "handcuffing under power."

18. An independent peer-reviewed study of off-the-shelf M26 and X26 devices determined that discharges to the chest of test animals resulted in cardiac capture. When a test animal was given epinephrine to simulate the agitated state of an individual being shocked during a confrontation with the police, a single ECD administration produced ventricular fibrillation and cardiac arrest.

19. By 2005, the link of multiple, repeated or prolonged ECD applications to a separate and distinct mechanism for cardiac arrest became undeniable. Metabolic acidosis, the build-up of lactic acid in the bloodstream from excessive muscle contractions, is a known cause of cardiac arrest. The relationship between repeated ECD-induced muscle contractions and severe metabolic acidosis was documented in a study sponsored by the United States Air Force, and in a series of experiments conducted by independent researchers in Chicago.

20. The risks posed by the introduction of ECDs were documented in the most thorough etymological study to date. Independent researchers from the University of California, San Francisco, School of Medicine determined that in-custody deaths increased six-fold during the year following the first deployments of TASER International products in the surveyed California law-enforcement agencies.

21. Beginning in September 2009, TASER International training and warning materials include the following: "Law enforcement personnel are called upon to deal with individuals in crises [who] are often physiologically or metabolically compromised and may be susceptible to arrest-related death . . . . Any physiologic or metabolic change may cause or contribute to death or serious injury."

22. TASER Intentional warning material includes the following: "Neurocardiogenic Response (Fainting). A person may experience an exaggerated response to an ECD exposure, or threatened exposure, which may result in a person fainting or falling with possible secondary injury."

23. Anxiety caused by ECD application or threatened application may result in vasovagal syncope (fainting).

24. Ventricular fibrillation caused by ECD application may also result in syncope (fainting).

*The events of May 21, 2013*

25.     On May 21, 2013, Plaintiff was at the Department of Justice Building, 950 Pennsylvania Ave., NW participating in a protest.

26.     Plaintiff was peacefully protesting and holding the arm of another protester when, without warning, a FPS/DHS officer tased her.

27.     TASER training materials, which, on information and belief, the FPS/DHS officer was familiar with, state: "ONLY USE TO STOP A THREAT. NEVER USE FOR PHYSICAL COERCION."

28.     The FPS/DHS officer tased Plaintiff in an attempt to make it easier for officers to handcuff her and not because Plaintiff posed a threat to her or anyone else.

29.     As a result of the tasing, Plaintiff fell down and her right hip hit the ground, causing her injury.

30.     Plaintiff has experienced long-term injuries as a result of the incident, including mental and physical pain, flashbacks, anxiety, scarring, and aches.

31.     As a result of the incident, Plaintiff has undergone extensive physical therapy.

32.     The physical therapy was not successful in eliminating all of Plaintiff's pain and she has been referred to a neurologist for further treatment.

33.     The use of Tasers can lead to catastrophic injury or death and for this reason many law enforcement jurisdictions place ECD use just below lethal force in their use of force continuum. The FPS/DHS officer should never have used the Taser against Plaintiff. Further, the governmental interest at stake was minimal as Plaintiff was suspected only of committing a minor non-violent misdemeanor, posed no immediate threat to the safety of officers or others, and was not actively resisting or attempting to

5

evade arrest by flight. The FPS/DHS officer also failed to exhaust less drastic alternatives before using the TASER.

## COUNT I:
## FEDERAL TORT CLAIMS ACT

34. This Count realleges and incorporates by reference the allegations of each of the preceding paragraphs.

35. Plaintiff, through her attorney, submitted an administrative claim for damages to FPS/DHS on September 6, 2013. The claim was subsequently denied. Plaintiff is filing this Complaint within 6 months of the denial of her claim.

36. The United States is liable for the tortious actions of the DHS/FPS officer who tased Plaintiff because he was acting within the scope of his employment with the DHS/FPS.

37. The officer who tased Plaintiff committed the torts of assault, battery, and intentional infliction of emotional distress against Plaintiff by using excessive force against her.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

(1) Award Plaintiff compensatory damages in an amount to be determined at trial;

(2) Grant Plaintiff an award of litigation costs reasonably incurred in this action;

(3) Grant Plaintiff such other and further relief which the Court deems proper.

Respectfully Submitted,

_____
Jeffrey L. Light
D.C. Bar #485360
1712 Eye St., NW
Suite 915
Washington, DC 20006
(202)277-6213
Jeffrey.Light@yahoo.com

*Counsel for Plaintiff*